May it please the court and counsel my name is Jason Wood I'm attorney for the appellant in this matter I'm trying to recover from the flu so I apologize in advance if I have a coughing fit that's why I'm down here counsel on video so you have my utmost sympathy and you have mine as well thank you excuse me as I'm sure the court has thoroughly reviewed the briefs I will dispense with going through in detail the facts of the case other than to just give a brief summary my client Kevin Mays was a chronic alcoholic he was arrested for violation of a civil protection order on November 7th of 2008 and incarcerated in the Nez Perce County Jail in Idaho sometime before the 14th of November Mr. Mays began suffering and experiencing symptoms of acute alcohol withdrawal syndrome or delirium treatments his symptoms worsened over time over the next two days beginning with hallucinations becoming gradually more incoherent began harming himself and on two prior occasions before he suffered the injury that's the subject of this case he had beaten his head against the door and walls of his cell resulting in bleeding that sort of thing let me ask you let me just say what do we do with the fact that they said disputed they took him to the doctor that Sunday afternoon I I think ultimately that's the crux of probably both the district judge's decision as well as the and our position your honor is that although they did take him to the hospital for emergency room treatment the record actually indicates the reason they did was not because of necessarily alcohol withdrawal syndrome delirium treatments but because he was injured his hand I suppose that's a little indirect but the doctor noted that he was having alcohol problem alcohol withdrawal true he indicated that it was alcoholic hallucinosis which my understanding is that that's a less severe form of alcohol withdrawal there as I indicated in the brief there's although the doctor did note some hallucinations and there's some indication that the deputy that transported mr. Mays to the hospital had indicated that he'd had a hallucination on the way there there's no evidence that the suicide watch or log or any of the other incidents that were reported prior to transportation to the emergency room were conveyed to the doctor so there's no evidence that the doctor actually had all the information necessary to make a doctor examined him right the doctor did examine him and and he was and then made his notes and ultimately released him correct gave him some treatment gave him some treatment gave him him an injection of thiamine and said return in the following Monday which was a day and a half later for follow-up I thought it was Monday on Sunday around midnight that he was at the hospital in that right on the final yes first time and then he said come back tomorrow in effect okay I could be wrong on my in my life I thought it was a son in any event could I just point I interrupted you said that he had banged his head before he went to the hospital my understanding is that he had hallucinations and that at some point he started smashing the wall the bars or something door with his hand but the that the headbanging happened after he had gone to see the doctor at the hospital that's correct your honor I did not mean to indicate that I meant is a he had returned from from the hospital on the 16th of November that he started banging his head against the doors and walls that had all this transpired over fairly you know within 24 hours or less didn't that's correct he returned shortly after midnight on the 16th of November from the hospital and the head wound that resulted in his subdural hematoma occurred approximately 20 hours later so during that as I understand it they progressed from he progressed as he started inflicting pain on himself aside from the hitting the hitting with his hand they put him in that restraint chair which I understand your expert thinks was inappropriate and his defendants expert disputes that in any restraint chair for about an hour and then they released him and then they kept him if I'm correct on 15-minute watches so that they were looking in on him and then in some interval apparently a 15-minute interval he really whacked his head that's correct but what happened that's correct although I would point out so if that's the case counsel you know this is deliberate indifference not a negligence case so could you zero in on where the deliberate indifference was well that wasn't the first it there were actually two prior incidents of him banging his head against the wall before before he suffered the subdural hematoma one where they put him in the restraint chair actually before the restraint chair there is a there is a reference that that's what I mean that that's why he they put him in the restraint chair because because there had been two prior occasions that's correct they're on on one occasion deputy gunner responded there was blood all over the walls he didn't put maize in the restraint chair then not too long afterwards he did it again and they and they put him in the restraint chair but but the restraint chair even the restraint chair did not help with the with the symptoms of delirium cremus he was continuing to harm himself even when he was in the restraint chair he was picking in his chest and produce a wound there he was able to re wound his head we don't know exactly how if he banged his head against the wall able to move the restraint chair or something like that and notation was made that he was able to produce new bruises as well and so with regard to the deliberate indifference our position is that the the head banging in self-harm incidents that the deputies were clearly placed on notice that these were these were problems he kept doing them and every solution that they attempted to attempted to provide him in relief that they attempted to provide him none of them worked and they knew none of them and so they release him from the restraint chair knowing that at any time he could do exactly what he had done on two previous occasions which was banging his head why why in your view if they if they've done a X Y and Z and none of its effective and then they release him from the chair why is that equivalent to deliberate indifference as contrasted with negligence because they because they had knowledge of facts that in fact to both Martin and Gunter knew that mr. Mays was suffering from delirium treatments they knew that it was a serious health condition that could result in death and and after observing the very behaviors that ultimately on at prior occasions resulted in his severe hematoma none of the things that they did worked and then they just released him to go back and do it again and so what they what should they have done what they should have done and I and I think I've cited several cases to the court that indicate that in those circumstances specifically in the in the delirium treatments context is what they should have done is notify medical personnel the case laws we've cited indicates that they can't just simply rely on medical treatment or examination that occurred 20 hours before when the symptoms by their own defendants own admission continued and actually even worsened and and he continued to suffer those they personally observed them these two of the deputies actually knew about delirium treatments and that mr. Mays was suffering from them and they failed to contact medical personnel that in my in our view is the very definition of deliberate indifference particularly where Jacqueline Martin had testified that all the deputies have received thorough training on on delirium treatments and that medical personnel should be notified when when the need arise arises and so for that reason we believe that there was deliberate indifference here I would like to reserve my remaining time to thank you your honor may it please the court Sonia Lee nooch for the appellees the Nez Perce County deputy jailers in this case and as you've heard throughout the oral argument and read in the briefing obviously we have a two-prong analysis here whether or not there was a serious medical need and then whether or not the deputy jailers were deliberately indifferent to that need I want to start with this issue of delirium tremens first of all you have heard an oral argument today and seen in the briefing that mr. Mays was one of the 5% of those individuals who developed delirium tremens when they're going through alcohol withdrawal there is no credible evidence in this case anywhere in the record that mr. Mays had delirium tremens nowhere what we see is first of all cases cited by the plaintiff that agree that delirium tremens and those symptoms will begin within 8 to 48 hours of the onset and so of the last drink and we know that mr. Mays was incarcerated on November 7th 2008 we don't start seeing anything until a week later so he's completely off course for delirium tremens for me to begin with your position that he was not suffering from a serious medical condition on our position is he was not suffering from delirium that's not my question is my question is is it your position that he was not suffering from a serious medical condition on that day on that on for the medical condition that he was suffering from and so at the time that this really been treated and taken care of and he had no problems I wouldn't say that your honor he had problems but the definition of whether or not it's a serious medical you think there's at least a tribal issue of fact over that no I don't I don't think there's a tribal issue when he comes back and starts banging his head on the wall it's your position that he wasn't there's no tribal issue of fact as to whether or not he was suffering from a serious medical condition I don't think there's a need when you take into account the jailers right I think if you take into account the notes of the jailers specifically deputy Brown who's the one who was responsible for getting him to the doctor in the first place when you look at his notes on the second day he says that his conditions actually improving at that point that he's no longer shaking he's no longer having the issues he was having before which shows us that the condition he was experiencing wasn't the delirium tremens which requires immediate hospitalization but was actually alcohol withdrawals which is often managed in the jail setting a serious medical needs means we got to get him to the hospital right now that's the issue but alcohol withdrawals as we saw in this he had a serious condition because they did take him to the hospital they initially took him to the hospital your honor because the doctor told him he had to come to bring him back on Monday morning right they they took him to the hospital because he had been banging his arm the night before and he had injured it and it was swollen at that point that was the reason they took him there fortunately for us the deputy the patrol deputy who was responsible for taking him there had also been involved with mr. Mays before and so he explained to the doctor that this guy had had a hallucination on the way over that his blood alcohol levels normally 0.2 or 0.3 that he's often a very violent individual so the doctor's focus changed it went from just looking at the arm to then looking at this hallucinosis issue and fortunately for us the doctor did a full workup and what he said was he had no overt signs of withdrawal he had an intentional tremor which meant if he was watching him then he would start shaking that his gait was perfectly normal that all of his vital signs were perfectly normal and he wasn't toxic all of those scenes are something you would see with delirium tremens but if you're talking about just alcohol withdrawal which is often managed in the jail setting that's what we're dealing with so there's no evidence that mr. Mays has delirium tremens just let me just ask you this let's just assume for a moment if you know this is summary judgment qualified immunity we take any just any dispute in facts and like most favorable to the non-moving party in this case it's the point that's correct and let's just assume for a moment you do that that he's shown that there was a serious medical condition so then he's got to get over then he's got to show that that that the officers were deliberately indifferent correct your honor if and I don't think that he can meet that burden absolutely not so ever well the reason he at least show that there's a tribal issue of fact I don't think there's a tribal issue of fact because what we're not dealing with negligence we're not dealing with gross negligence we're dealing with deliver and that is a very very high standard it requires showing that these deputy jailers had a culpable state of mind it requires a showing here in a case that this circuit just heard on January 2nd 2013 Pierce versus long the court in that case held that it's a must show that the defendant acted in a can that's a manner akin to criminal recklessness we have deputy jailers who once he comes back from the doctor they are watching him like a hawk his behavior is not significantly different I understand that he was pushing his head against the wall and they want to characterize it as bashing but if you look at the record what mr. Mays was doing and the day before he had been banging his hand and he was loosing the day after he comes back from the hospital after he returns he's pushing his head against the wall when deputy Martin says to Kevin Mays don't do that stop doing that you're creating a cut on so she puts him in the restraint chair whether or not you agree that decision there's nothing as far as case law that says that putting an individual incarcerated in a restraint chair is a constitutional violation she puts him in the restraint chair in this situation he's released at 255 nothing nothing happens until 820 that night from three o'clock to eight o'clock at night there is nothing going on he is sitting in his cell he's sitting on the bunk he's not banging his head he's not injuring himself he's not doing anything so how are the deputy jailers for five hours they're observing him checking on him every 15 minutes your honor that they started that on Saturday night so they are going through this entire log watching him every 15 minutes like a hawk there is no information in the record that any of the deputies actually drew the inference that he needed to go to the emergency let me ask you one question about the state of the record is there anything in the record that would show express evidence of state of mind of the deputies like any comment from a deputy about what they thought about this person there is your honor and in fact there are several in the depositions that were provided in the record deputy Martin said that he was having the same behavior that he was having before that's at 115 25 page 49 she also said that because he had gone to the doctor and they had sent him back that she said I believe if it was a serious situation they would not have sent him back to the jail in our custody at that time they all stated in their affidavits which is submitted in the under seal record supplemental excerpts of record that they thought that he was improving that he had not changed significantly and that he had gone to that doctor that morning and that none of them believed that he needed to emergency room any sooner than he was already going to go there which was the next morning for follow-up blood tests so yes that is in the record each of them we went through each of them individually to lay out that information of what they were thinking at the time Gabe Richardson deputy Richardson he's the one who was the closest with and he's the one who found him and so he went through and explained he was the one giving him Kool-Aid and making sure that he was staying hydrated and he thought he was coming out of it alcohol withdrawals are often managed in the jail setting there's no question about that and so we have any Ninth Circuit precedent about when you can infer deliberate indifference from circumstantial evidence because I assume it's pretty rare case where the government actor employee would say I really indifferent to what this guy does I suppose that's true your honor there there certainly are some cases out there that talk about the facts being so obvious that the court can then assume that because the facts are so obvious the individual should have inferred that but we don't have that case here when you have an individual who's sitting there doing nothing for five hours not harming himself not injuring himself not yelling out not saying he's going to try to commit suicide he's not doing anything when they pull him out of the restraint chair he's calmed down he's already been to the doctor we don't have that situation here where the facts were so severe that the court is then just going to assume that the deputy should have known something different and I think that's a really important issue of delirium trimmings versus this detox situation which is often managed in the jail setting and we have deputy Martin saying you know I understood that there that DT's means delirium trimmings but you see that their deputies are using that interchangeable I mean and that's what happened in Spears versus County of Barium to does he have a does he have a negligence claim under under under Idaho law he does not because of the Idaho tort claims act he does not have a negligence claim because he was in custody if he thought he had misdiagnosed him potentially but not against not against the deputies not against the county correct correct yeah because he was in custody at the time the Idaho tort claims act includes that and he also did not file any state claims in relation to that just federal claims so okay so in final I think obviously the issue here is the fact the standard is deliberate indifference I mean it's it's such a very high standard we're not dealing with negligence we're not dealing with gross negligence and nothing in the record that mr. Mays can point to that would establish deliberate indifference on the behalf of any of these individual deputies I mean he's named everyone including deputy Brown who actually arranged for him to receive medical treatment they were all watching him like a hawk they were making sure that nothing happened to him and if anything would have happened they would have made sure that he received medical treatment which they did at 820 when he injured himself so because of that we're asking that you uphold the lower courts determination that dismissal was appropriate thank you thank you as much okay mr. wood I have less than 30 seconds Stacy could you put the time up to a minute so minute of rebuttal here thank you regarding the subjective state of mind we have to to at least two of the deputies that admitted under oath that they knew mr. Mays was suffering from DTS delirium treatments that they understood DTS meant delirium treatments and that it was a serious health condition and that mr. Mays was suffering from it even after he returned from the hospital they didn't even rely I mean the council is relying upon the hospital the hospital's opinion but the officers themselves were not relying on the hospital they continued to believe despite the treatment after Mays returned from the hospital that he that he suffered from delirium treatments and and deputy that's the case counsel then you're sounding you're cutting against deliberate indifference it seems to me you're saying that they're willing to be concerned about DTS you're just quarreling with the steps that they took to implement it well if they if someone has actual knowledge that someone is suffering from an admittedly serious life-threatening disease and and they what they do is they simply continue to monitor and that doesn't work he continues as they as Richardson testified he continued throughout that day to be incoherent hallucinating yelling talking to imaginary friends all those things he continued to do that up throughout the day and yet they put him in a restraint chair he beat his head against the wall once they didn't do anything they just said we'll make note of it they put him in a restraint chair he continued to harm himself even when he was in a restraint chair after the second time he beat his head against the walls they really didn't and that didn't help because he continued to hurt himself and then lo and behold he did the exact same thing that they knew that he'd done before in the recent past and this time it resulted in a severe hematoma they were on notice that what they were doing wasn't working and that it was a serious life-threatening condition and they didn't call medical personnel which they were trained to do and they failed to do it and we believe that is the very definition of deliberate indifference hey mr. mr. Wood I'm afraid your time is up I'm sorry thank you over but thank you thank you for your argument we thank both ms. nuts and mr. mr. wood for their nice arguments and the case of Mays versus Stokoe shall be submitted
judges: Fisher, Gould, Paez